UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

*In re*:                                                    Case Number: 20-10231-7

     BEVERLY A. KRIZAN,

          Debtor.

     TRAVIS P. KRIZAN and
     RONALD V. KRIZAN,

          Plaintiffs,
      v.                                          Adversary Number:  20-15

     BEVERLY A. KRIZAN,

          Defendant.

## **DECISION**

Plaintiffs Travis Krizan and Ronald Krizan filed a complaint seeking a determination that debts owed by Beverly Krizan and others[1] are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2) as having been incurred by false pretenses, misrepresentation, or actual fraud.

After hearing the arguments of counsel, considering all the documentary and testimonial evidence and weighing the credibility of the witnesses, the Court issues this decision constituting the Court's findings of fact and

---

[1] The other debtors include Beverly's deceased husband and her sons Scott and Dale. Scott and Dale are defendants in similar adversary proceedings in their respective bankruptcies.

conclusion of law.[2] For the reasons more fully described below, the Court finds that Travis and Ronald have met their burden of proof that debts owed by Beverly to them are nondischargeable as set forth below. A separate judgment will be entered pursuant to Rule 9021.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. §157(b)(2)(I) as it concerns a determination about the dischargeability of a particular debt. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

Beverly and her husband Daniel were dairy farmers. She was also a teacher. Beverly and Daniel defaulted on their mortgage to Farm Credit Services ("FCS") and a foreclosure was filed. Beverly and Daniel, helped by Dale and Scott, engaged in many acts to delay the foreclosure. They:

- Quitclaimed the property to an Otis Williams for no consideration.

- Williams filed a real estate UCC four days later.

- They signed an offer to purchase from Chad and Beverly Webster on May 2, 2013. Scott also signed the offer.

- Ten months later, Beverly and Daniel gave life estates to Scott and Dale by quit claim deeds.

- On March 25, 2014, Otis Williams quitclaimed the property back to Daniel and Beverly. But his UCC security interest was not released or satisfied until June 22, 2015.

---

[2] This matter was tried in a hearing consolidated for evidence presentation only with the adversaries against the other debtors. The other adversaries are Case Nos. 20-16 and 20-17.

2

- Eventually Dale and Scott quitclaimed their life estate in the property back to Daniel and Beverly.

- Another offer by the Websters was dated March 27, 2014.

Dale was the architect of the efforts other than the Webster offer. He admits discovering the tactics from the internet and seminars. The efforts slowed but did not stop the foreclosure. A sheriff's sale of the property was scheduled for April 1, 2014.

While stories diverge about the initiation of conversations, on March 27, 2014, there was a meeting among Travis, Ronald, Scott, Daniel, and Beverly. The meeting occurred at the home of Beverly and Daniel. The location of the meeting is described as a kitchen and dining room separated by an island. Daniel and Ronald were seated at the dining table, Scott and Travis were at the island, and Beverly was in the kitchen.

Beverly did not testify. Scott confirmed she was present at the meeting. He tried, unconvincingly, to suggest Beverly was not paying attention to the discussion by saying she was busy cooking. Ronald and Travis agree she was cooking but testified credibly that she was aware of and participated in the discussion about the terms for a sale. Not only was she part of the discussion, they plausibly testified she made requests about improvements to the property as part of the rental after a sale.

The terms for the sale to Travis and Ronald were discussed and agreed upon. Travis, Ronald, Beverly, Daniel, and Scott all signed a handwritten offer. Two days later, that offer was replaced with an offer on the more detailed

3

Wisconsin Realtor form. Again, it was signed by Plaintiffs, Beverly, Daniel, and Scott. The offer said a down payment in the amount of $430,000 would be made. The down payment was the amount needed to pay off the FCS mortgage. The possibility this was a secondary offer to a prior accepted offer such as the Webster offer was marked "n/a."

Travis, Ronald, Beverly, Daniel, and Scott went to FCS on March 28, 2014. Travis and Ronald each paid $215,000 to FCS. The half of the payment from Travis was funds he borrowed. FCS then released and satisfied its mortgage.

Ronald and Travis credibly testified they did not know about the Webster offer when they paid FCS. They very sincerely testified if they had been told about the Webster offer they would not have made the payment without other steps and protections, including taking an assignment of the note and mortgage from FCS. The reasons for this position were explained and are credible. Travis's experience in real estate transactions further supports the credibility of his testimony.

Scott said he did tell Travis about the Webster offer before the offer from Travis and Ronald and before the payment to FCS. This testimony was not credible at all. Scott also said he thought the Webster offer was invalid. His testimony was disingenuous.

Scott's claim that Travis was aware of the Webster offer was further contradicted by Scott himself. Scott was served with a *lis pendens* on April 6. Scott testified that he talked to his parents about the Webster lawsuit and that

they responded they wanted to proceed with a sale to Travis. This discussion could not have occurred until the day before the closing. Title work for a closing with Ronald and Travis was prepared, and on April 7, Ronald, Travis, Beverly, Daniel, and Scott attended a closing. Yet, at the closing, Scott, Daniel, and Beverly all proceeded to sign documents and act as if there was no Webster offer. After the documents were signed, the title agent then conducted a quick update of the title search only to discover that the Websters had filed the *lis pendens* that was served on Scott the day before. Scott admitted he was aware of the *lis pendens* and had discussed it with Beverly and Daniel. The three decided to proceed with the closing and remain silent about the Webster offer. It was not until the closing agent returned to the room and said the closing could not continue because of the *lis pendens* that Ronald and Travis became aware of the Webster offer. The reaction of Scott, Daniel, and Beverly was to maintain the Webster offer was not enforceable. In response, the title agent suggested they talk to a lawyer.

Ronald and Travis testified they were told the Webster *lis pendens* was a mistake and that the Webster offer had never been delivered. They say this was the first time they were told anything about another offer. This view was reinforced by the statements made by either Scott or Daniel that the Webster offer was not valid.

Beverly, Daniel, and Scott all submitted an answer in a declaratory judgment action the Websters brought to enforce their offer. The answer said:

> . . . deny that they have entered into a written Offer to Purchase with the Plaintiff's [Webster] which was identified in Exhibit A dated May

> 2, 2013, upon information and belief of the Defendants, the Offer to
> Purchase may have been signed but was never delivered and was in
> the house of the Krizan's . . . and was never delivered to the Plaintiffs
> but the Plaintiff [Webster] came upon the premises, entered the
> premises and upon deceit and misrepresentation obtained a copy of
> the Offer to Purchase. The Defendants never intended to release that
> signed Offer to Purchase to the Plaintiffs and is unknown other than
> upon information and belief as to how the Plaintiff's obtained the
> original document from the household of the Defendants.

ECF No. 37, Exh. 39 at 1.

A few days later, an amended answer was filed by Beverly, Daniel, and Scott. The only change to the above portion of their answer was the addition of the phrase "upon information and belief" to the claim the Websters "came upon the premises." Both the answer and the amended answer filed shortly after were filled with claims that the Webster offer was not valid, that the Websters purloined the offer, there was no closing date, and that no action was taken by Beverly, Scott, or Daniel to close with Webster.

In an about-face, the position of Beverly, Scott, and Daniel changed a little more than ten months later. After being deposed in February 2015, they admitted that the Webster offer had been delivered to the Websters by Scott. Delivery was with the knowledge of Beverly. No explanation was provided for this change of position other than the claim by Scott that (1) the Websters hadn't scheduled a closing, (2) the Websters prepared a new offer, and (3) the Websters said if the new offer was not accepted they would simply bid at the sheriff sale. None of this explained the failure of Scott and Beverly to disclose the Webster offer to Plaintiffs before any payment to FCS.

At the trial in this adversary proceeding, Scott says this led him to believe the accepted Webster offer was no longer good. He also asserted, unconvincingly and incredibly, that he had told Ronald and Travis about the Webster offer before Ronald and Travis made their offer. This testimony was not believable.

Ronald and Travis intervened in the state court action. Their testimony that they believed the Webster offer was invalid was credible and supports their action of intervening.

A state court decision was issued finding the Websters had the primary offer. Appeals ensued. Ultimately there was a sale to the Websters. The circuit court and state court of appeals found Travis and Ronald were entitled to repayment from the Webster closing of the amount they paid to FCS. The appeals court declined to award interest but remanded the matter to the circuit court for further proceedings on the claims of Ronald and Travis against Beverly, Daniel, Scott, and Dale.

On August 28, 2017, Ronald and Travis received $430,000.

Between 1994 and 1999, Ronald loaned more than $30,000 to Daniel for the farm. The loan included cash and an account receivable for hay Daniel bought from Ronald. Some small payments were made by Daniel. Additionally, there was a $10,000 loan to Dale.

Ronald kept track of the amounts owed for hay and the cash loans. Ronald and his wife calculated interest on the unpaid amounts and periodically gave the calculations to Daniel. Daniel signed a copy of those accountings in

March 1999. In October 2002 and September 2009, an updated copy of the accounting was signed by Daniel, Beverly, Scott, and Dale. The amounts owed including accrued interest totaled $64,986.58 as of 2009. No payments have been made on the amounts and, with additional interest at 7%, Ronald claims he is owed $102,170.59 as of March 14, 2014. He argues this amount was not only a debt of Daniel but, because they signed the 2002 and 2009 accountings it became a debt of Beverly, Scott, and Dale. He and Travis also testified that forgiveness of this amount in the form of an assumption of the debt by Travis was other consideration in their offer to purchase the property.

Scott testified that he, Dale, and Beverly merely signed the accountings to acknowledge the calculations and not to assume the debt.

## DISCUSSION

A discharge of indebtedness in bankruptcy is reserved for the "honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S. Ct. 695, 78 L. Ed. 1230 (1934); *Grogan v. Garner*, 498 U.S. 279, 286, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991). To carry out this "fresh start" policy of bankruptcy relief, exceptions to discharge are narrowly construed with all doubts resolved in the debtor's favor. *In re Chambers*, 348 F.3d 650, 654 (7th Cir. 2003); *DeKalb County Div. of Family & Children Servs. v. Platter (In re Platter)*, 140 F.3d 676, 680 (7th Cir. 1998); *Miller v. Gentry (In re Miller)*, 55 F.3d 1487, 1489 (10th Cir. 1995), *cert. denied*, 516 U.S. 916, 116 S. Ct. 305, 133 L. Ed. 2d 210 (1995). The burden of proof for establishing an exception to

8

discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. at 286-87.

### A. Nondischargeability for False Pretenses, False Representations, and Actual Fraud

Section 523(a)(2)(A) is phrased in the disjunctive, meaning that false pretenses, false representation, and actual fraud are three separate grounds for nondischargeability, and these independent causes of action require proof of different elements. *Aeschliman v. Vraney (In re Vraney),* 2020 WL 1696104, at *8-9, 2020 Bankr. LEXIS 980, at *24-26 (Bankr. N.D. Ill. March 31, 2020). Interpreting that provision of section 523(a)(2)(A) in *Husky Int'l Elecs., Inc. v. Ritz*, the Supreme Court rejected the Debtor's argument that the phrase requires a court "to ignore what [was argued to be] Congress' 'imprudent use of the word "or,"' and read the final item in the list to modify and limit the others." *Husky Int'l Elecs., Inc. v. Ritz,* __ U.S. __, 136 S. Ct. 1581, 1590, 194 L. Ed. 2d 655 (2016); *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 222-23 (B.A.P. 10th Cir. 2013); *Ray Klein, Inc. v. Webb (In re Call)*, 560 B.R. 814, 821 (Bankr. D. Utah 2016). While the elements for each theory under section 523(a)(2)(A) differ, the common thread is a debtor's intent to defraud a creditor. *Houston v. Munoz (In re Munoz)*, 536 B.R. 879, 884 (Bankr. D. Colo. 2015). Because false pretenses and actual fraud represent different concepts, they have somewhat different meanings and each merits a brief discussion. The Court will outline the elements for each cause of action in the order set forth in section 523(a)(2)(A).

False pretenses under section 523(a)(2)(A) are implied misrepresent-tations intended to create and foster a false impression. *Sturgeon*, 496 B.R. at 223. Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions. *Id.* "Instead, omissions or a failure to disclose on the part of a debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Landmark Credit Union v. Reichartz (In re Reichartz)*, 529 B.R. 696, 701 (Bankr. E.D. Wis. 2015) (quoting *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 928 (Bankr. N.D. Ill. 1996)). Silence or concealment can also constitute false pretenses. *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 86 (Bankr. N.D. Ill. 2002). *See also Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1374-75 (10th Cir. 1996) (failure to disclose may constitute a false representation or false pretenses).

To prove that a debt arose from a false representation, the plaintiff must prove by a preponderance of evidence the traditional, long-standing elements for proving misrepresentation or fraud under the common law of torts in the Restatement (Second) of Torts, § 525 (1976) as understood when section 523(a)(2)(A) was enacted in 1978. *See Field v. Mans*, 516 U.S. 59, 69, n.9, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995). Those elements are that (1) the debtor made a false representation; (2) the representation was made with the intent to deceive the creditor; (3) the creditor relied on the false representation; (4) the creditor's reliance was justifiable; and (5) the creditor was damaged as a result.

*Id.*; *Young*, 91 F.3d at 1373; *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009).

Where there is a duty to speak, both concealment and silence can constitute fraudulent representations. A misrepresentation is not required to constitute fraudulent representation. As stated in *Hentges*:

> When a debtor has an affirmative duty to disclose information, the failure to convey the information may be considered a false representation for purposes of Section 523(a)(2). Moreover, "false pretense[s] as used in § 523(a)(2)(A) includes material omissions, and means 'implied misrepresentations or conduct intended to create and foster a false impression.'" "An overt misrepresentation is not required, because 'omissions or a failure to disclose on the part of the debtor can constitute misrepresentations for the purpose of nondischargeability where the circumstances of the case are such that omissions or failure to disclose create a false impression which is known by the debtor.'" (citations omitted).

*Marks v. Hentges (In re Hentges)*, 373 B.R. 709, 725 (Bankr. N.D. Okla. 2007).

An intent to deceive may be inferred from a "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005). Still, "[a]n honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive." *DSC Nat'l Props., LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 173 (B.A.P. 10th Cir. 2012).

In *Husky*, the Supreme Court stated that, to the extent "actual fraud" is alleged, such term does not require an actual misrepresentation on the part of the wrongdoer. *Id.* at 1587. Before *Husky*, courts used the terms "fraudulent

representation" or "actual fraud" interchangeably. But *Husky* recognized the distinction between the various types of fraud set forth in section 523(a)(2)(A). The Supreme Court did not define with precision what acts constituted "actual fraud." Rather, it cryptically noted the term "fraud" has been defined broadly to be "anything that counts as fraud and is done with wrongful intent" and connotes "deception or trickery." *Id.* at 1586; *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 11 (B.A.P. 10th Cir. 2016); *Call*, 560 B.R. at 821.

This definition is much like that stated by the Tenth Circuit B.A.P. in *Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 690 (B.A.P. 10th Cir. 2013), in which the court held that "[w]hen a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." Wrongful intent can be manifested "[w]hen a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right." *Thompson*, 555 B.R. at 11.

Although false pretenses and false representation represent different concepts, the elements of scienter, reliance, and materiality are common to both and must be proven by a preponderance of the evidence for the creditor to prevail. The elements—other than reliance—are also common to fraud claims. Intentional fraud does not require reliance, but if the fraud takes the form of a misrepresentation, reliance is necessary. *CQM, Inc. v. VandenBush (In re VandenBush)*, 614 B.R. 306, 315 (Bankr. E.D. Wis. 2020).

Any of the three types of conduct specified in section 523(a)(2)(A) (false pretenses, misrepresentation, or actual fraud) have been narrowly construed by some courts to limit the harsh result of nondischargeability to "frauds involving moral turpitude or intentional wrong." *Johnson*, 477 B.R. at 169. "[F]raud implied in law which may arise in the absence of bad faith or immorality" is not sufficient. *Id.*; *Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 787 (B.A.P. 10th Cir. 1998) (quoting *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir. 1986) (abrogated on other grounds by *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654)). The debtor must have acted with the subjective intent to deceive the creditor. *First Nat'l Bank v. Cribbs (In re Cribbs)*, 327 B.R. 668, 674 (B.A.P. 10th Cir. 2005), *aff'd*, 2006 WL 1875366 (10th Cir. 2006); *Holzhueter v. Groth (In re Holzhueter)*, 575 B.R. 444, 453 (Bankr. W.D. Wis. 2017).

Because fraudulent intent is rarely admitted by a debtor, courts uniformly recognize it may be established by circumstantial evidence or by inferences drawn from a course of conduct or from the totality of the circumstances. *United States v. Goodstein*, 883 F.2d 1362, 1370 (7th Cir. 1989); *Cribbs*, 327 B.R. at 673; *Copper v. Lemke (In re Lemke)*, 423 B.R. 917, 922 (B.A.P. 10th Cir. 2010) (citing *Young*, 91 F.3d at 1375); *Steege v. Johnsson (In re Johnsson)*, 551 B.R. 384, 407 (Bankr. N.D. Ill. 2016). The "totality of the circumstances inquiry is fact specific and hinges on the credibility of witnesses." *Graham v. Graham (In re Graham)*, 600 B.R. 90, 95-96 (Bankr. D. Kansas 2019). Intent may be inferred when the facts and circumstances

13

present a picture of deceptive conduct on the debtor's part. *Manny v. Udelhoven (In re Udelhoven)*, 624 B.R. 629, 648 (Bankr. N.D. Ill. 2021).

Turning now to the credible evidence, the evidence presented at trial persuades this Court that Beverly:

- Actively participated in the negotiation and finalization of the offer with Travis and Ronald;

- knew of the Webster offer;

- had a duty to disclose the Webster offer;

- failed to disclose it and, in the typed offer, affirmatively represented there was no other accepted offer;

- was aware of the *lis pendens* and the Webster lawsuit and failed to disclose it but instead attended a closing, signed closing documents, and joined either by silence or affirmatively in the assertion the Webster offer had never been delivered making it invalid; and

- participated in continued misrepresentations to Ronald and Travis about the Webster offer.

There were multiple, material misrepresentations, omissions, and nondisclosures by Beverly. The purpose was to obtain substantial payments from Ronald and Travis to pay off FCS and avoid a foreclosure for the benefit of Beverly, Daniel, and Scott.

Beverly appears to contend that she made no false representation because she was not a participant in the negotiations. The only testimony suggesting this was the incredible testimony of Scott. While the pleadings assert her sole role in everything was signing the documents Scott asked her to, there was no credible testimony to support this claim.

14

Beverly signed the Webster offer. She was present during the discussion, negotiation, and signing of the Ronald and Travis offer. She then signed a more formal typed offer from Ronald and Travis. She went with them to FCS for the payoff of the loan. She never mentioned the Webster offer.

Days later, after discussing the Webster lawsuit with Scott, she attended a closing, signed closing documents, and maintained silence about the Webster offer until the closing agent disclosed it. She did not speak up at that time when Ronald and Travis were told Webster had "stolen" the offer. While admitting an offer had been submitted by the Websters, she maintained it was never delivered and was invalid. Thus, Beverly's continued silence constitutes a false representation or omission. Further, her conduct in quitclaiming property for no consideration and similarly granting life estates demonstrates a pattern of deceit and deceptive conduct.

Beverly argues she just signed what Scott gave her. The credibility of this argument cannot be judged based on testimony because it was merely argument of counsel. Even if some credence is given to the argument that she just signed what Scott told her to sign, signing a document without reading it is not an absolute defense. A false representation can be made with knowledge that it is false or reckless disregard for the truth. "[I]t is reckless in the extreme for a person to sign any documents without reading them, or to sign blank documents." *Holmes v. Nat'l City Bank (In re Holmes)*, 414 B.R. 115, 130 (E.D. Mich. 2009). All the same, "failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and

15

disclosure is necessary to correct what would otherwise be a false impression."
*Handler v. Moore (In re Moore)*, 620 B.R. 617, 628 (Bankr. N.D. Ill. 2020) (citing
*Baermann v. Ryan (In re Ryan)*, 408 B.R. 143, 157 (Bankr. N.D. Ill. 2009)).

The only credible evidence on this issue shows that when Beverly signed the offer from Ronald and Travis she was fully aware of the delivery of the Webster offer. She was aware of and participated in the negotiations with Travis and Ronald. She knew they would pay $430,000 to FCS to avoid a sheriff sale and lead to the satisfaction of her obligations to FCS. She failed to disclose the Webster offer despite her knowledge of that offer and continued to maintain deception about it.

Beverly made a misrepresentation. It was made with intent to deceive. At the least, it was made with reckless disregard of the truth in a circumstance where Beverly should have known it would create a false impression that the Ronald and Travis offer was the only offer. She knew or should have known of the fraud or falsity of the representations to Ronald and Travis. *Sullivan v. Glenn*, 782 F.3d 378, 381 (7th Cir. 2015) (quoting *In re Walker*, 726 F.2d 452, 454 (8th Cir. 1984)). The dishonesty and lack of credibility is further supported by the pattern of deceitful acts to impede the foreclosure—deeds to Williams without consideration and quit claim deeds to Dale and Scott.

Ronald and Travis justifiably relied on the representations. The offer to the Websters had not yet closed or been recorded. They had no way to determine whether there was another offer or if they were the first offer. The falsity here was not easily detectable. It was represented this was not a

16

secondary offer. The belief that their offer was first led them to pay $430,000 to FCS without seeking a security interest in the property.

Ronald and Travis credibly testified to justifiable reliance on these material misrepresentations and nondisclosures. They credibly testified that no payment would have been made if the truth had been disclosed or, if it had been, that they would have tried to secure the payments to assure recovery of the $430,000, interest, and costs and attorneys' fees. Ronald and Travis relied on the representations of Beverly in negotiating and signing both the written and then the typed offer and accompanying them to FCS without a mention of the Webster offer. The reliance was justifiable.

They sustained losses as a proximate result of the material misrepresentations and nondisclosures. And the Court concludes that the material misrepresentations and nondisclosures found above also fall into the category of "false pretenses" under section 523(a)(2)(A) of the Bankruptcy Code. When considered collectively, Beverly's actions created a contrived and misleading understanding that the Offer was being complied with—specifically about purchase of the property by Ronald and Travis being possible upon payment to FCS.

The payment to FCS benefited Beverly and was to the detriment of Ronald and Travis. Further, her conduct and acquiescence in the representations that no offer had ever been delivered to the Websters until almost eleven months after FCS was paid continued and reinforced the false pretense and misrepresentation. This all induced Ronald and Travis to pay FCS

and to intervene in the Webster litigation to protect what they believed to be a first priority offer.

The Court finds that Beverly's conduct and omissions created an overall false impression that induced Ronald and Travis to pay $430,000 to FCS without taking an assignment, without taking any other steps to protect the payment, and to intervene and stay in the state court litigation longer— ultimately causing them harm. *Tomlinson v. Clem (In re Clem)*, 583 B.R. 329, 384 (Bankr. N.D. Tex. 2017).

For these reasons, the Court concludes that the claims of Travis and Ronald against Beverly related to the offer and payments to FCS fall within the ambit of section 523(a)(2)(A) of the Bankruptcy Code and are nondischargeable.

In addition to nondischargeability of sums related to the offer to purchase, Ronald asks for judgment against Beverly for the principal and interest on the hay and various loans made to Daniel between 1994 and 1999.[3] The assertion any such sums are due from Beverly or, even if she has a personal liability, that the amounts are nondischargeable fails for three reasons.  First, the loans were made to Daniel and not to Beverly. Second, the last of the loans was made more than 20 years before the bankruptcy was filed and the statute of limitations on the claims has passed. Finally, there is no evidence that hay was delivered or that loans were made based on any representation or omission by Beverly.

---

[3] ECF No. 37, Exh. 12.

The fact that years after the last hay delivery or cash advance she may
have signed a paper containing the mathematic calculation of interest on the
value of the hay or the amount of the loans does not in any way provide a
scintilla of evidence she made any false representation or any representation
with intent to deceive Ronald. Neither do those documents demonstrate
anything other than acknowledgement of the math. There is no promise to pay
on the documents.

The hay and loans to Daniel are simply prepetition debts of Daniel. Even
if considered marital or community debts, no personal liability of Beverly has
been shown and no action constituting false representations, pretenses, or
actual fraud for this debt has been proven. Further, the money had long been
loaned and hay long before delivered, so there is no evidence that Ronald relied
on any representation of Beverly. While nonexempt community property may
have been subject to a community claim, none exists, and for the foregoing
reasons, those debts are dischargeable.

**B. Damages and Collateral Estoppel**

Ronald and Travis were repaid the sums they paid to FCS. So Beverly
argues there are no damages. Ronald and Travis counter that the damages are
more than simply the amounts paid to FCS. It took 41 months for their
payments to FCS to be repaid. During that time they lost the time value of the

money, paid interest on a loan of half that amount, and had other costs and

losses flowing from the offer with Beverly, Daniel, and Scott.[4]

The proper measure of damages according to Ronald and Travis is

determined under the state law claim for theft-by-fraud are:

> (1) the defendant made a false representation to the owner of the property;

> (2) the defendant knew that the representation was false;

> (3) the defendant made the representation with the intent to deceive and defraud the property's owner;

> (4) the defendant got title to the property as a result of the false representation;

> (5) the owner of the property was deceived by the representation; and the owner of the property was thus defrauded.

*Malzewski v. Rapkin*, 2006 WI App 183, 296 Wis. 2d 98, 723 N.W.2d 156; Wis.

Stat. § 943.20(1)(d).

A party that prevails under this statute may have a right to damages

under Wis. Stat. § 895.446(3). If the above elements were demonstrated by a

preponderance of the evidence, the debt as it relates to Beverly would also meet

the state statute elements. Appropriate damages are also nondischargeable.

Beverly contends that some of the damages requested by Ronald and

Travis are precluded by issue preclusion or collateral estoppel. She suggests

that the only possible recovery Ronald and Travis could have would be for

attorneys' fees. She suggests that the state court decisions denying Ronald and

---

[4] They also assert other damages related to transactions with Dale. Such amounts are addressed in a separate decision in the adversary proceeding against Dale.

Travis interest and time value of the money paid to FCS precludes them from seeking those damages in the nondischargeability action. This argument fails.

She also argues any claim for "ground preparation" should not be allowed because Plaintiffs won the bid to rent the Defendant's farm and therefore any money spent for ground preparation was for Ronald and Travis's own benefit. No evidence was presented on this claim for damages. As a result, Plaintiffs failed to meet their burden of proof on the rent and ground preparation damages.

"The doctrine of issue preclusion prevents relitigation of an issue of fact or law previously decided in a judicial proceeding provided the party against whom the prior decision was asserted enjoyed a full and fair opportunity to litigate that issue in the earlier proceeding." *Elbing v. Blair (In re Blair)*, 359 B.R. 233, 237 (Bankr. E.D. Wis. 2007) (citing *Allen v. McCurry*, 449 U.S. 90, 94–95 (1980)). Whether issue preclusion applies is a question determined by state law. *In re Bulic*, 997 F.2d 299, 304 n.6 (7th Cir. 1993).

Wisconsin uses a two-step analysis for questions of issue preclusion. *Blair*, 359 B.R. at 237. "The first step is to determine whether a litigant against whom issue preclusion is asserted is in privity with a party or has sufficient identity of interests to comport with due process." *Id.* (citing *Paige K.B. v. Steven G.B.*, 226 Wis. 2d 210 (1999)). "The next step in issue preclusion analysis is whether applying issue preclusion comports with principles of fundamental fairness. This is generally a discretionary decision, although some

of the factors the court is to consider in determining fairness present a question of law." *Id.*

The factors that courts may consider when undertaking the second step of issue preclusion are: (1) could the party against whom preclusion is sought, as a matter of law, have obtained review of the judgment; (2) is the question one of law that involves two distinct claims or intervening contextual shifts in the law; (3) do significant differences in the quality or extensiveness of proceedings between the two courts warrant relitigation of the issue; (4) have the burdens of persuasion shifted such that the party seeking preclusion had a lower burden of persuasion in the first trial than in the second; or (5) are matters of public policy and individual circumstances involved that would render the application of collateral estoppel to be fundamentally unfair, including inadequate opportunity or incentive to obtain a full and fair adjudication in the initial action." *Id.* (citing *Michelle T. v. Crozier,* 173 Wis. 2d 681, 689, 495 N.W.2d 327 (1993)).

The standards applied to judgments when determining preclusion are clear and discernible. The state courts did not make specific findings of fact which would preclude the issue of damages. While Ronald and Travis did obtain some recovery at the closing with the Websters, that did not constitute specific findings of fact that would require this Court to infer dispositive facts about the damages in this adversary. This adversary does not involve claims against the Websters. The Websters prevailed in the decision they held the primary offer. This case, instead, is about claims against Beverly. None of the

22

findings in the state courts determined the misrepresentation or fraud claims

asserted by Ronald and Travis against Beverly. As noted in the Wisconsin

Court of Appeals' summary disposition in *Krizan v. Krizan:*

> Based on this record, it appears the Intervening Krizans'
> misrepresentation and fraud claims asserted in the Third Amended
> Intervention Complaint have been pending since 2015 and have not
> yet been litigated.  We therefore reverse the order dismissing those
> claims and remand to the circuit court for further  proceedings.[5]

*Krizan v. Krizan*, No. 2018AP916-FT, 3 (Wis. Ct. App. April 30, 2019)

(wicourts.gov (unpublished)).

The claims before this Court are for nondischargeability under section

523(a)(2)(A). This section denies discharge if the debt was for money or property

"obtained by false pretenses, false representations, or actual fraud." *Gambino v.*

*Koonce*, 757 F.3d 604, 607 (7th Cir. 2014). Although claims were asserted in

the state court between Plaintiffs and Defendant, there was no final judgment

or trial on those claims. Before any trial or final hearings were held in state

court, Beverly filed bankruptcy. So the matter has not been actually litigated.

While it is true that the state court denied Ronald and Travis statutory

interest, this denial was not determined through the lens of fraud or

misrepresentation claims against Beverly. It arose in the context of the claims

of the Websters that their offer was primary and they were entitled to purchase

the property under the terms of the Webster offer. Because the fraud or

misrepresentation claims had not been litigated in the state court, damages

under those claims have likewise not been litigated.

---

[5] Adv. No. 20-16, ECF No. 28, Exh. 8 at 3.

The standards for applying collateral estoppel are also well established. "Indeed, though the federal courts may look to the common law or to the policies supporting res judicata and collateral estoppel in assessing the preclusive effect of decisions of other federal courts, Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so . . . ." *Allen v. McCurry,* 449 U.S. 90, 96, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980).

Wisconsin's Supreme Court has adopted a five-factor "test" for deciding whether to give a finding collateral estoppel effect. *DeGuelle v. Camilli,* 724 F.3d 933, 937 (7th Cir. 2013) (citing *Estate of Rille v. Physicians Ins. Co.,* 2007 WI 36, 300 Wis. 2d 1, 728 N.W.2d 693, 707)). "No weight is assigned to any factor; the weighting is in the discretion of the trial court." *Id.* The factors are:

1) Could the party against whom preclusion is sought have obtained review of the judgment as a matter of law;

2) Is the question one of law that involves two distinct claims or intervening contextual shifts in the law;

3) Do significant differences in the quality or extensiveness of proceedings between the two courts warrant relitigation of the issue;

4) Have the burdens of persuasion shifted such that the party seeking preclusion had a lower burden of persuasion in the first trial than in the second; and

5) Are matters of public policy and individual circumstances involved that would render the application of collateral estoppel to be fundamentally unfair, including inadequate opportunity or incentive to obtain a full and fair adjudication in the initial action?

*Id.*

24

Collateral estoppel is inapplicable. There is no judgment on the claims between Ronald and Travis, or against Beverly, so no review could have been pursued. The state court proceedings were stayed by Beverly's bankruptcy, so there were no findings or judgment to which the other elements of collateral estoppel apply.

There is no dispute that Ronald and Travis each paid $215,000 to FCS on March 28, 2014. The payment satisfied the debt of Beverly and Daniel to FCS. This payment benefited Beverly. It was made as the down payment and consideration for the offer to purchase accepted by Beverly. Beverly and Daniel did not sell the property to Ronald or Travis. Instead, at the time the payment was made to FCS, Beverly and others maintained silence and represented to Ronald and Travis that their offer was a first priority offer and acted as if they would sell to Ronald and Travis. The credible testimony confirmed that Beverly's sole goal was to prevent a foreclosure sale at any cost and by any means without regard to the facts or truth.

Judy Brandner, a title agent, testified that in 2013 Chad Webster had financing, ordered title work, and was ready to close but for resolution of the title issues related to Williams, the Dale and Scott quit claims deeds, and judgments. There was no cooperation from Beverly, Daniel, Scott, or Williams. Title issues created by Beverly and others prevented a closing on the Webster offer. While between the two offers some clouds on title created by Beverly and others were resolved, some remained. Then Ronald and Travis were misled. The final cloud on title in the form of the Williams UCC was not released until June

2015. On April 15, 2016, there was finally an order directing closing with

Webster within 30 days. However, that didn't occur for another 16 months. The

tangled title web created by the actions of Beverly and others so clouded title

and led to such delays that closing within that time was not possible. Once

again, Beverly and others achieved the goal of delaying the time when Beverly

and Daniel no longer owned the property.

The amount of the debt is to be determined under state law. It is

determinable and liquidable by an objective standard. As a liquidated debt,

Ronald and Travis are entitled to interest at 5% per annum under Wisconsin

law.[6] Ronald and Travis were each deprived of the use of $215,000 for 1,249

days—the time elapsed between the payment to FCS and the repayment to

them of $430,000 at the closing of the sale to the Websters. At the simple legal

rate of 5% on $215,000 for this number of days, Ronald and Travis would each

be entitled to interest in the amount of $36,783.05.

Ronald is not entitled to damages for the hay sold on account to Daniel.

Travis is not entitled to damages for the time he estimates he spent on the

dispute with Beverly.

### C. Attorneys' Fees

Defendants may be entitled to attorney fees, but the Court cannot

determine any amount based on the record before the Court. The fees must be

---

[6] Under Wis. Stat. § 138.04, a creditor is entitled to interest upon the "forbearance" of any money due. *See also Klug & Smith Co. v. Sommer*, 83 Wis. 2d 378, 384, 265 N.W.2d 269 (1978); *Wisconsin Alumni Research Found. v. Gen. Elec. Co.*, 880 F. Supp. 1266, 1278 (E.D. Wis. 1995).

reasonable in amount and related solely to the misrepresentation claims. If such fees are requested, counsel must submit a detailed request for fees. Any such request is subject to objection and further proceedings.

### CONCLUSION

For the reasons above, Ronald and Travis are each entitled to a judgment of nondischargeability against Beverly in the amount of $36,783.05.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order and judgment consistent with this decision will be entered.

Dated: July 15, 2021

BY THE COURT:

_____
Hon. Catherine J. Furay
U.S. Bankruptcy Judge